NO. 16-2993

IN THE UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

UNITED STATES OF AMERICA,
Appellee

v.

CLIFTON MCLEAN,
Appellant

APPEAL FROM JUDGMENT OF CONVICTION AND SENTENCE
IN CRIMINAL NO. 13-00487-01 IN THE
UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

BRIEF FOR APPELLEE UNITED STATES OF AMERICA

LOUIS D. LAPPEN
Acting United States Attorney

ROBERT A. ZAUZMER
Assistant United States Attorney
Chief of Appeals

ANDREW J. SCHELL
Assistant United States Attorney

615 Chestnut Street, Suite 1250
Philadelphia, PA  19106
(215) 861-8646

# TABLE OF CONTENTS

JURISDICTIONAL STATEMENT..................................................................1

    I.    Subject Matter Jurisdiction.........................................................1

    II.    Appellate Jurisdiction ................................................................1

STATEMENT OF ISSUES .........................................................................2

STATEMENT OF THE CASE ....................................................................3

    I.    Procedural History ....................................................................3

    II.    Statement of Facts .....................................................................5

STATEMENT OF RELATED CASES.........................................................14

SUMMARY OF ARGUMENT ....................................................................15

ARGUMENT...............................................................................................17

    I.    THE DISTRICT COURT DID NOT COMMIT ERROR IN DENYING THE DEFENDANT'S REQUEST FOR AN ENTRAPMENT JURY INSTRUCTION ................................................................17

        A.    There Was Insufficient Evidence of Inducement ....................................................................17

        B.    There Was Insufficient Evidence of Lack of Predisposition.................................................... 23

II.     THE DISTRICT COURT CORRECTLY RULED
        THAT THE GOVERNMENT COULD AND DID
        PROVE THE INTERSTATE NEXUS REQUIRED
        BY THE HOBBS ACT................................................................ 30

        A.     The Government is Not Required to Prove
               an Actual Effect on Interstate Commerce in
               Reverse Sting Fictitious Stash
               House Cases .................................................................31

        B.     The Government is Not Required to Prove
               That the Defendant's Conduct Would Have
               Affected Interstate Commerce Even in the
               Absence of Federal Intervention ..................................... 35

        C.     The Government Proved, Though Not Required
               To Do So, That the Defendant Would Have
               Engaged in Hobbs Act Robbery in the Absence
               of Federal Intervention .................................................... 40

III.    THE DEFENDANT WAS PROPERLY CONVICTED
        UNDER SECTION 924(c) BASED ON HIS HOBBS
        ACT ROBBERY CONVICTIONS............................................... 42

IV.     THE FELON-IN-POSSESSION STATUTE IS
        A VALID EXERCISE OF CONGRESS' POWER
        UNDER THE COMMERCE CLAUSE....................................... 50

CONCLUSION............................................................................................ 52

# TABLE OF AUTHORITIES

## Cases

Baptiste v. Attorney General,
    841 F.3d 601 (3d Cir. 2016) ............................................................... 43

Gibbs v. Cross,
    160 F.3d 962 (3d Cir. 1998) ............................................................ 50

Harris v. United States,
    2016 WL 830761 (D.N.J. 2016) ........................................................ 37

Hedgpeth v. Pulido,
    555 U.S. 57 (2008) .............................................................................. 46

Jacobson v. United States,
    503 U.S. 540 (1992) ........................................................................... 24

Johnson v. United States,
    135 S. Ct. 2551 (2015) ................................................................. 43, 46

Jones v. United States,
    529 U.S. 848 (2000) ..................................................................... 35, 51

Mathews v. United States,
    485 U.S. 58 (1988) ....................................................................... 18, 23

Min v. United States,
    2016 WL 1408099 (E.D. Va.  2016) ................................................. 37

National Federation of Independent Business
    (NFIB) v. Sebelius,
    132 S. Ct. 2566 (2012) ....................................................................... 35

Taylor v. United States,
    136 S. Ct. 2074 (2016) ................................................................. 38, 39

United States v. Clarke,
    649 F. App'x 837 (11th Cir. 2016) ................................................. 35, 36

United States v. Dennis,
    826 F.3d 683 (3d Cir. 2016)....................................... 17, 19, 22, 23, 28

United States v. DiSomma,
    951 F.2d 494 (2d Cir. 1991) ............................................................... 49

United States v. Evans,
    216 F.3d 80 (D.C. Cir. 2000) ........................................................... 18

United States v. Fedroff,
    874 F.2d 178 (3d Cir. 1989) ....................................................17, 24, 26

United States v. Garza-Juarez,
    992 F.2d 896 (9th Cir. 1993) ........................................................... 24

United States v. Gateward,
    84 F.3d 670 (3d Cir. 1996).............................................................50, 51

United States v. Gendron,
    18 F.3d 955 (1st Cir. 1994) ............................................................. 18

United States v. Haywood,
    363 F.3d 200 (3d Cir. 2004).............................................................. 38

United States v. Hill,
    832 F.3d 135 (2d Cir. 2016) ......................................................46, 48

United States v. Holland,
    503 F. App'x 737 (11th Cir. 2013) ...................................................... 36

United States v. Howard,
    650 F. App'x 466 (9th Cir. 2016) ....................................................... 46

United States v. Jannotti,
    673 F.2d 578 (3d Cir. 1982) ......................................................passim

United States v. Kelly,
    748 F.2d 691 (D.C. Cir. 1984) ............................................................ 18

United States v. Lopez,
    514 U.S. 549 (1995) ................................................................... 35, 51

United States v. Manzo,
    636 F.3d 56 (3d Cir. 2011) ........................................................ 33, 34

United States v. McGuire,
    178 F.3d 203 (3d Cir. 1999) ............................................................. 30

United States v. Morrison,
    529 U.S. 598 (2000) ................................................................... 35, 51

United States v. Orozco,
    98 F.3d 105 (3d Cir. 1996) ............................................................... 37

United States v. Preston,
    910 F.2d 81 (3d Cir. 1990) ............................................................... 47

United States v. Robinson,
    844 F.3d 137 (3d Cir. 2016) .................................................. 16, 43-47

United States v. Rodriguez,
    360 F.3d 949 (9th Cir. 2004) ........................................................... 33

United States v. Shavers,
    693 F.3d 363 (3d Cir. 2012) ............................................................ 38

United States v. Singletary,
    268 F.3d 196 (3d Cir. 2001) ...................................... 16, 30, 42, 50, 51

United States v. Taylor,
    480 F.3d 1025 (11th Cir. 2007) ....................................................... 33

United States v. Urban,
    404 F.3d 754 (3d Cir. 2005) ...................................................... 35, 38

United States v. Walker,
    657 F.3d 160 (3d Cir. 2011) ............................................................ 37, 38

United States v. Walther,
    867 F.2d 1334 (11th Cir. 1989) ............................................................ 24

United States v. Ward,
    793 F.2d 551 (3d Cir. 1986) ............................................................ 24

United States v. Whitfield,
    649 F. App'x 192 (3d Cir. 2016) ........................................ 31, 32, 36, 41

United States v. Wright,
    921 F.2d 42 (3d Cir. 1990) ............................................................ 18, 19

## Statutes

18 U.S.C. § 16(b) ........................................................................ 46

18 U.S.C. § 922(g) ................................................................3, 6, 14, 50

18 U.S.C. § 924 ....................................................................passim

18 U.S.C. § 1951 ................................................................3, 14, 44

18 U.S.C. § 3231 ........................................................................1

21 U.S.C. § 841(a)(1), (b)(1)(A) ........................................................ 3

21 U.S.C. § 846 ................................................................3, 14

28 U.S.C. § 1291........................................................................1

# JURISDICTIONAL STATEMENT

## I. Subject Matter Jurisdiction

Because the defendant was charged in an indictment with violations of federal criminal law, the district court had subject matter jurisdiction over the case pursuant to 18 U.S.C. § 3231.

## II. Appellate Jurisdiction

Based upon the timely filing of a notice of appeal from the order of judgment in a criminal case entered on June 13, 2016, this Court has jurisdiction over this matter under 28 U.S.C. § 1291.

## STATEMENT OF ISSUES

1. Did the district court err by denying an entrapment jury instruction, where the defendant did not meet his burden of production to show either inducement or lack of predisposition?

2. Did the district court err by denying the defendant's motion for acquittal, premised on the purported lack of jurisdiction under the Hobbs Act regarding a planned robbery of fictitious cocaine?

3. Is Hobbs Act robbery a "crime of violence" under 18 U.S.C. § 924(c), which prohibits using and carrying a firearm during and in relation to a crime of violence?

4. Should this Court follow its previous ruling that the felon-in-possession statute is a valid exercise of Congress' power under the Commerce Clause?

## STATEMENT OF THE CASE

## I. Procedural History

On September 12, 2013, a grand jury in the Eastern District of Pennsylvania returned an indictment of Clifton McLean, charging him with one count of conspiracy to commit Hobbs Act robbery in violation of 18 U.S.C. § 1951(a) (Count One); one count of attempting to commit Hobbs Act robbery in violation of 18 U.S.C. § 1951(a) (Count Two); one count of conspiracy to possess with intent to distribute five kilograms or more of cocaine in violation of 21 U.S.C. § 846 (Count Three); one count of attempting to possess with intent to distribute five kilograms or more of cocaine in violation of 21 U.S.C. §§ 846 & 841(a)(1), (b)(1)(A) (Count Four); one count of carrying a firearm during and in relation to a crime of violence and a drug trafficking crime in violation of 18 U.S.C. § 924(c) (Count Five); and one count of possession of a firearm by a felon, in violation of 18 U.S.C. §§ 922(g) and 924(e) (Count Six). A co-defendant, Leroy Winston, was also charged in the indictment. App. 23-34.

McLean proceeded to trial, which began on May 4, 2015. At trial, McLean made an oral Rule 29 motion for judgment of acquittal, arguing that the government had not presented sufficient evidence of an effect on interstate commerce, and this motion was denied. App. 578-80. The district

court also denied McLean's request for an entrapment jury instruction, finding that McLean had not met his burden of showing sufficient evidence of inducement or lack of predisposition. App. 574-76. On May 8, 2015, the jury returned a guilty verdict on all counts against McLean. App. 743, 754.

McLean filed post-trial motions on March 15, 2016, and April 29, 2016. In these motions, McLean sought, among other relief, a judgment of acquittal on Counts One through Five on the basis that the government had not proven an effect on interstate commerce; a judgment of acquittal, or in the alternative a new trial, on Count Six on the basis that the government failed to prove the McLean's possession of the firearm had a substantial effect on interstate commerce; a new trial on Counts One and Two because the district court did not instruct the jury that the government had to prove that McLean violated the Hobbs Act and affected interstate commerce even in the absence of federal intervention; and a new trial on Count Five on the basis that Hobbs Act robbery does not qualify as a crime of violence within the meaning of 18 U.S.C. § 924(c)(3)(A) and the residual clause of Section 924(c)(3)(B) is unconstitutionally vague. App. 877-918. At a two-day sentencing hearing held on June 1 and June 2, 2016, the district court denied all of McLean's motions for new trial and/or judgment of acquittal. App. 924-30. The court sentenced McLean to a total of 19 years'

imprisonment followed by 10 years of supervised release and a special assessment of $600. App. 1050-51. McLean filed a timely notice of appeal. on June 27, 2016.

The court elected to impose a sentence below the statutory mandatory minimum, upon considering all pertinent circumstances. The government filed a notice of cross-appeal, which it later elected to withdraw.

## II. Statement of Facts

On June 18, 2013, a confidential informant (CI) reported to ATF Special Agent Patrick Edwards that a person known to the CI, later identified as Clifton McLean, had approached the CI and said that he was looking for "something to take" and he had a team ready. Special Agent Edwards, whose nine years of experience at ATF included infiltrating, in an undercover capacity, robbery crews which conducted home invasion robberies of drug dealers, understood McLean's statement to mean that he was interested in committing a robbery of narcotics. App. 92-94, 98-100, 102, 116. At the instruction of Special Agent Edwards, the CI met with McLean on June 19, 2013, so that ATF could determine if McLean was in fact interested in doing a home invasion robbery. App. 101, 113. If McLean had not wanted to meet with the CI or otherwise not shown interest in

doing a robbery, then ATF would have terminated the investigation. App. 112.

During this June 19, 2013, meeting, which was recorded by the ATF,[1] the CI told McLean that he was meeting with him because McLean had expressed interest in doing a robbery, and that the CI had a potential stash house robbery job but wanted to make sure that McLean definitely wanted to do it. McLean replied that he did. The CI then said that the robbery involved a significant amount of drugs and wanted to be sure that McLean had a team of people who could do the robbery, and McLean replied that he had two other reliable and trustworthy people who could help with the robbery. McLean also said that he had previously sold cocaine in Harrisburg and heroin in Vermont, but had been laying low due to problems with law enforcement. App. 150-54, 190, 760-68. The CI asked if McLean had guns, and McLean replied that he had two guns, and that one of the members of his crew also had a gun. App. 157-58, 767.

On June 28, 2013, McLean called the CI and asked about the proposed robbery. After the CI replied that the robbery was going to happen, McLean stated that he was ready to participate in it. App. 117-18, 771-72.

---

[1] ATF recorded all of its subsequent communications with McLean.

On July 22, 2013, after McLean had sent a text message to the CI asking what's up, the CI, at the direction of ATF, had a telephone call with McLean. During their phone conversation, McLean asked for an update, and the CI said that they could meet with a third individual (in fact, Special Agent Edwards posing as a drug courier), and McLean replied that he wished to attend the meeting. App. 119-20, 773-74.

On August 1, 2013, in Philadelphia, McLean met with the CI and Special Agent Edwards who was posing in an undercover capacity as a drug courier who regularly came to Philadelphia from New York to pick up cocaine from a stash house. App. 42, 122. Special Agent Edwards told McLean that he went to the stash house to pick up kilograms of cocaine, that there were usually at least eight to nine kilograms of cocaine in the stash house (which at the time had a street value of approximately $320,000), and that there were people inside the stash house who were armed and protecting the cocaine. App. 127-29, 335, 782-83. On multiple occasions during the conversation, Special Agent Edwards asked McLean if he wanted to do the robbery, and each time McLean said yes, even saying he was ready to do the robbery that very day. When Special Agent Edwards said the robbery would occur in the next week or two, McLean replied, "All right. We can do that." App. 127-28, 782, 788-89. Edwards

told McLean the people inside the stash house would be armed so that McLean understood that the robbery was potentially dangerous, and could back out if he was not inclined to do this type of robbery. McLean, however, remained enthusiastic about doing the robbery. App. 135, 783-84.

During the meeting, Special Agent Edwards did not instruct McLean how to do the robbery, except to say he wanted to make sure it did not look like he was involved in the robbery. Nor did he tell McLean to bring guns to the robbery. App. 135, 788. McLean, however, told Edwards about how he planned to conduct the robbery, stating that people inside the stash house "ain't gonna open the door for us" so that the robbery would be "basically bum rushing the house," and he planned to tie up the people inside the stash house before leaving with the drugs. App. 132-34, 137, 787-90. Edwards understood these comments to mean that McLean had prior experience conducting stash house robberies. App. 137.

When Special Agent Edwards asked how many people McLean needed to do the robbery, McLean replied that he could do it with Leroy Winston, who had driven McLean to the meeting but did not participate in it. App. 123-24, 133-34, 789.[2] McLean explained Winston was capable of

---

[2] Winston testified McLean had asked him to help him take part in

helping with the robbery and McLean did not want "too many people to be fucking shit up in our action," which Edwards understood to mean that McLean only wanted to share the proceeds from the robbery with a small group of people. App. 134, 789. Special Agent Edwards said he wanted to get two to three kilograms of cocaine from the robbery with McLean keeping the rest, and McLean agreed. App. 137-38, 790. Special Agent Edwards told McLean he would provide the location and time of the robbery a day or two beforehand, and that he would be in touch. App. 791.

On August 8, 2013, the CI reached out to McLean to set up a meeting with Special Agent Edwards. App. 140, 793-40. Later that day, McLean met with the CI and Edwards. During the meeting, Edwards told McLean the robbery was definitely happening the next week and there would likely be a third person inside the stash house during the robbery. McLean, without any hesitation, enthusiastically said that he still wished to do the

---

the robbery, which McLean said was to be a robbery of some drug dealers. McLean did not tell Winston he did not know how to do a drug dealer robbery. Winston was not surprised when McLean came to him with this proposed robbery, because McLean and Winston had previously discussed robbing drug dealers, and on one occasion in 2009 or 2010 Winston had robbed a drug dealer at the request of McLean, who did not want that drug dealer working on the same block where McLean sold drugs. Winston had told McLean that he frequently robbed drug dealers, and that he was willing to do a robbery of a drug dealer if McLean learned of an opportunity to do so. App. 336, 339, 341-44, 347-49.

robbery, and described how he would do the robbery by pointing a gun at one of the people in the stash house and instructing the others in the house to get down on the ground. App. 143-45, 799. In a phone call later that day, the CI told McLean that Edwards was having doubts about McLean, and was thinking about finding someone else. In response, McLean reaffirmed his commitment to doing the robbery. App. 801-03.

On the following day, August 9, 2013, the CI called McLean to arrange another meeting with Special Agent Edwards. The CI asked McLean to bring all the members of his robbery crew to the meeting, and McLean agreed. App. 158-61, 804-06. Later that day, McLean, Winston, the CI, and Edwards met to discuss the robbery. At the beginning of the meeting, McLean and Winston said they thought the robbery was going to take place in New York, and were relieved to learn that the robbery instead would occur in Philadelphia, although they indicated they would have been willing to travel to New York if necessary.[3] Special Agent Edwards told them there would not be any money in the stash house, and the people protecting the stash house were armed and willing to do whatever they had to do to protect the stash house. McLean replied he did not think the

---

[3] Winston testified that during this meeting McLean's eagerness to do the robbery was, on a scale of 1 to 10, a "10." App. 359.

people protecting the stash house were willing to die for the cocaine since the cocaine did not belong to them, but if they were willing to die, so be it. McLean also confirmed it was still his plan to tie up the people inside the stash house during the robbery, and stated that "we know what we doing." App. 162-65, 357-59, 823.

On August 13, 2013, the CI called McLean and told him the robbery would occur the next day. The CI asked McLean if he could sell all of the cocaine stolen from the stash house, and give Edwards his share of the proceeds in cash. McLean replied, "we can make that happen." App. 166, 828. The next morning, the CI picked up McLean and Winston and drove them to a hotel parking lot in Philadelphia to meet with Special Agent Edwards. App. 167, 171. On the way to the meeting, the CI had asked McLean and Winston how they planned to do the robbery. McLean replied the stash house would not have surveillance cameras because it was an abandoned building, and that during the robbery they would pose as police officers, which is a tactic used by stash house robbers to convince the occupants of the house to drop their weapons and abandon the drugs. App. 173-74, 379, 384-85.

Once they arrived at the meeting, Edwards asked McLean and Winston if they still wanted to do the robbery, and neither expressed any

desire to back out, with McLean saying he was "born ready" to do the robbery. App. 167, 171, 848. Had McLean or Winston said he did not want to do the robbery, ATF would not have arrested them but instead let them go free. App. 171-72. Later during the meeting, McLean told Special Agent Edwards that he would need to play a part in the robbery, and during the robbery he planned to put his gun in Edwards' face to make it appear as though Edwards was also a victim of the robbery. McLean also said he was prepared to shoot all of the occupants of the stash house in the head. App. 175-77, 382. Special Agent Edwards, the CI, McLean, and Winston then traveled to a junkyard, where ATF arrested McLean and Winston. App. 179. When they arrived at the junkyard, McLean and Winston possessed two loaded firearms. App. 315-320, 370-72. Both firearms were operable, and had been manufactured outside of Pennsylvania. App. 321-22. Both McLean and Winston attempted to flee when they saw law enforcement officers approaching them to perform the arrest. App. 395.

During the investigation, Special Agent Edwards, on approximately eight to ten separate occasions, gave McLean an opportunity to back out of doing the robbery by asking him if he was serious about doing the robbery and really wanted to do it. Edwards asked these questions for the purpose of trying to dissuade McLean from doing the robbery if he was not

predisposed to doing it. McLean never expressed any reluctance to commit the robbery. McLean also did not say that he normally did not commit robberies of drug dealers or that he was only doing so in this case because he needed to make money to pay his bills. If McLean had made any of these kinds of statements during the investigation, ATF would have terminated the investigation. App. 120-21, 378, 507.

## STATEMENT OF RELATED CASES

McLean's co-defendant Leroy Winston pleaded guilty to one count of Hobbs Act conspiracy, in violation of 18 U.S.C. § 1951(a); one count of attempted Hobbs Act robbery, in violation of 18 U.S.C. § 1951(a); one count of conspiracy to possess with intent to distribute five kilograms or more of cocaine, in violation of 21 U.S.C. § 846; one count of attempted possession with intent to distribute five kilograms or more of cocaine, in violation of 21 U.S.C. § 846; one count of carrying a firearm during and in relation to a crime of violence and a drug trafficking crime in violation of 18 U.S.C. § 924(c); and one count of possession of a firearm by a felon, in violation of 18 U.S.C. § 922(g). Winston received a sentence of imprisonment of 60 months and one day followed by three years of supervised release. He did not appeal this sentence.

The government filed a notice of cross-appeal in this case on July 26, 2016, which was docketed in this Court at No. 16-3227. The government moved to withdraw its appeal on September 14, 2016, and this Court dismissed the appeal on September 15, 2016.

## SUMMARY OF ARGUMENT

1. The district court did not err in denying McLean's request for a jury instruction regarding entrapment, as McLean failed to provide sufficient evidence that he was induced to commit the stash house robbery, or that he lacked the predisposition to commit such a robbery. Instead, the evidence demonstrated that McLean had directed others to rob drug dealers in the past, expressed an interest in committing robberies to the government's informant even before the informant proposed the stash house robbery, demonstrated a knowledge of how to commit a stash house robbery, and consistently expressed an eagerness to do the robbery despite being given numerous opportunities by the undercover agent and the confidential informant to back out of it.

2. The district court properly denied McLean's motion for judgments of acquittal, on the ground that the government could not satisfy the jurisdictional interstate commerce element of the Hobbs Act because the intended target of the robbery – a stash house containing eight to nine kilograms of cocaine – was fictional. This Court has held that where, as here, the defendant agreed to do acts which, had they been attainable, would have affected commerce, the interstate nexus requirement is

satisfied and federal jurisdiction exists. *United States v. Jannotti*, 673 F.2d 578 (3d Cir. 1982) (en banc).

3. McLean incorrectly asserts that Hobbs Act robbery is not a "crime of violence" under 18 U.S.C. § 924(c), such that he should be absolved of a 924(c) conviction for carrying a firearm during and in relation to the attempted stash house robbery. This Court recently resolved this question in *United States v. Robinson*, 844 F.3d 137 (3d Cir. 2016), denying the claim.

4. This Court has already ruled that the felon-in-possession statute, 18 U.S.C. § 922(g)(1), is a constitutionally permissible exercise of Congress' power under the Commerce Clause. *United States v. Singletary*, 268 F.3d 196 (3d Cir. 2001). The defendant does not make any new argument but simply raises an objection to preserve his claim should the Supreme Court one day overrule *Singletary*. The defendant is not entitled to relief on this basis.

# ARGUMENT

## I. THE DISTRICT COURT DID NOT COMMIT ERROR IN DENYING THE DEFENDANT'S REQUEST FOR AN ENTRAPMENT JURY INSTRUCTION

### Standard of Review

The district court's decision not to charge the jury on the entrapment defense involves a matter of law and this Court's review is plenary. *United States v. Fedroff*, 874 F.2d 178, 182 (3d Cir. 1989).

### Discussion

Defendant/appellant Clifton McLean argues that the district court erred when it denied his request during trial for a jury instruction on entrapment. This argument is meritless. In order to obtain the instruction, McLean was required to produce sufficient evidence to show both that the government induced him to commit the stash house robbery, and also that he was not predisposed to commit the crime. *See Fedroff*, 874 F.2d at 181. As discussed below, McLean failed to meet this requirement.

### A.    There Was Insufficient Evidence of Inducement.

In order to meet his burden of production regarding inducement, a defendant must show more than a "mere solicitation" or request by the government to participate in a criminal activity. *United States v. Dennis*,

826 F.3d 683, 690 (3d Cir. 2016). Similarly, "evidence that Government agents merely afforded an opportunity or facilities for the commission of the crime" would be insufficient to warrant . . . an [entrapment] instruction." *Mathews v. United States*, 485 U.S. 58, 66 (1988). *See also United States v. Wright*, 921 F.2d 42, 45 (3d Cir. 1990) (the mere fact that a government agent first suggested the illegal conduct is not enough to establish inducement); *United States v. Kelly*, 748 F.2d 691, 698 (D.C. Cir. 1984) (inducement shown only if government's behavior was such that "a law-abiding citizen's will to obey the law could have been overborne"); *United States v. Gendron*, 18 F.3d 955, 961 (1st Cir. 1994) (inducement "consists of [providing] an 'opportunity' plus something else – typically, excessive pressure by the government . . . or the government's taking advantage" of the defendant in an improper way.); *United States v. Evans*, 216 F.3d 80, 90 (D.C. Cir. 2000) ("Even when a government agent repeatedly requests that the defendant engage in criminal conduct, inducement is not established unless the requests are coupled with persuasive overtures.").

Instead, a defendant must come forward with evidence of government overreaching, such as "persuasion, fraudulent representation, threats, coercive tactics, harassment, promises of reward or pleas based on need,

sympathy or friendship." *Wright*, 921 F.2d at 45. The fact that a defendant was the target of a reverse sting operation does not, by itself, mean that the defendant has met his burden of production regarding inducement. *Dennis*, 826 F.3d at 691.

McLean cannot meet this standard, as there was no evidence that the government induced him to rob the stash house. While the government proposed the stash house robbery to McLean, it did so only after McLean had first expressed interest to the CI in committing a robbery of narcotics. App. 150-51, 763. Moreover, as noted above, even if the CI had first approached McLean about doing the robbery, this would not be enough to establish inducement. *See Dennis* at 690. Nor is there any evidence that the government used coercive or harassing tactics to convince McLean to take part in the robbery. McLean consistently expressed his eagerness to do the robbery, even before the CI told him during their June 19, 2013, meeting that the stash house would contain a significant amount of drugs. Indeed, Winston, McLean's partner in the robbery, testified that McLean's eagerness to do the robbery was a "10" on a scale of 1 to 10. Furthermore, McLean showed up at his first meeting with the undercover agent prepared to do the robbery that very day, and was even prepared to do the robbery if stash house was in New York. During his conversations with the CI and the

undercover agent, McLean eagerly described how he would do the robbery, explaining that he planned to pose as a law enforcement officer and yell "police, freeze" when he entered the stash house, then point guns at the people inside the stash house to get them on the ground before tying them up and taking the cocaine. McLean also said that he was prepared to kill the people inside the stash house if necessary. The undercover agent and the CI repeatedly asked McLean if he was sure he wanted to do the robbery, giving him numerous opportunities to back out of it. McLean, however, never expressed any hesitation about doing the robbery. Far from being induced to commit this robbery, McLean instead was someone who wanted to do a robbery, and eagerly jumped at the opportunity to rob a stash house.

McLean, nevertheless, contends that his interactions with the CI and the undercover agent constituted "harassment, persuasion and promises of reward," and therefore McLean met his burden of production as to inducement. Br. 27. McLean, however, can point to little in the record to back up his claim. He first claims that phone records showing that the CI initiated contact with McLean on multiple occasions in the period before the CI's recorded meeting with McLean on June 19, 2013, "support an inference of harassment and persuasion by the CI." Br. 26. However, there is nothing in the record to suggest that these calls were made as part of a

pattern of harassment and persuasion. The phone records themselves show that most of these calls only lasted a few seconds, App. 870-76, and neither the CI nor McLean say anything during their recorded meeting on June 19, 2013, to suggest that the CI had to engage in a campaign of harassment and persuasion to convince McLean to come to the meeting. To the contrary, that conversation shows that McLean initially reached out to the CI to inquire about robberies, and that the CI had not yet told McLean the quantity of drugs stored in the stash house.

McLean next contends that he was induced to participate in the robbery because the government promised a "great reward" when the CI and later the undercover agent told him how much cocaine would be in the stash house. Br. 26-27. This, however, ignores the fact, as noted above, that McLean, during his first recorded meeting with the CI, expressed a willingness to do the robbery even before the CI told him that there would be a lot of cocaine in the stash house. App. 761-62 (the CI asked if McLean "definitely want[ed] to do that joint" and McLean replied, "Yeah, I do."). Moreover, the promise of a reward, by itself, does not constitute inducement. Otherwise, every government reverse sting operation, which invariably promises a reward to the defendant who is willing to undertake the proposed criminal behavior, would involvement inducement. *See*

*Dennis,* 826 F.3d at 691 (holding that reverse sting operations do not necessarily involve inducement, and finding that the promise of a $1.5 to $2 million payoff was only inducement when considered with other facts, including the informant's appeal to the defendant's sympathies).

Finally, McLean claims that he was induced because the CI suggested that McLean would need a team of people to commit the robbery and first brought up the need for firearms, and because in later conversations the CI and the undercover agent "demanded that McLean demonstrate that he was ready to do the job" asked that McLean have bring a "professional" team of robbers. Br. 27. However, neither the CI nor the undercover agent told McLean to bring firearms to the robbery, nor did they demand that McLean show that he was ready to do the robbery. Instead, the CI asked if McLean had any firearms, in order to find out if McLean had the weapons needed to do the robbery and to determine the likelihood that McLean would be armed when he was arrested. App. 157. Meanwhile, the CI and the undercover agent talked with McLean about his team in order to learn who would be participating in the robbery, so that ATF could conduct the arrest safely and to ensure that the undercover agent had an opportunity to meet with each team member and ensure that each of them understood the nature of the robbery and wanted to participate in it. App. 159-60. Far from

an attempt to induce McLean to commit the robbery by convincing him that the robbery would be easy, these statements instead showed McLean that the robbery would be challenging, and gave him an opportunity to back out of it. McLean, however, consistently stated, without hesitation, that he was ready, willing, and able to do the robbery. For these reasons, the district court was correct to determine that McLean had not met his burden to show inducement.

### B. There Was Insufficient Evidence of Lack of Predisposition.

The predisposition inquiry focuses on whether the defendant "was an unwary innocent or, instead, an unwary criminal who readily availed himself of the opportunity to perpetrate the crime." *Mathews v. United States*, 485 U.S. 58, 63 (1988)*; see also United States v. Dennis*, 826 F.3d 683, 692 (3d Cir. 2016) ("The basic question in an alleged entrapment case is whether the accused was ready and willing to commit the crime if any opportunity should be presented, or whether a person not otherwise disposed to wrongdoing was corrupted by some overreaching or special inducement, often amounting to reprehensible conduct."). Predisposition may exist without prior criminal involvement: "the ready commission of the criminal act," such as where a defendant promptly accepts an undercover agent's offer of an opportunity to buy or sell drugs or rob and steal them,

may itself establish predisposition. *See Jacobson v. United States*, 503 U.S. 540, 550 (1992). *See also United States v. Fedroff*, 874 F.2d 178, 183 (3d Cir. 1989) ("Lack of prior illegal conduct alone will not satisfy the defendant's burden of production on non-predisposition."). The defendant's acts after the initial government contact are also relevant to his predisposition. *United States v. Garza-Juarez*, 992 F.2d 896, 908 (9th Cir. 1993) ("[E]vidence of predisposition may arise both before the government's initial contact and during the course of dealings.").

Here, the record contained ample evidence that McLean was predisposed to commit robberies of drug dealers. His criminal record included four previous convictions for drug trafficking and prior arrests for robbery and attempted murder and gun possession. As the district court found, while McLean was not convicted of any prior violent offense, a history of arrests should be taken into account on the assumption that an acquittal or dismissal does not necessarily mean that the defendant was not involved in the violent behavior charged. App. 41. *See also United States v. Ward*, 793 F.2d 551, 555-56 (3d Cir. 1986) (defendant's prior arrest admissible to show predisposition to rebut an entrapment defense); *United States v. Walther*, 867 F.2d 1334, 1342-43 (11th Cir. 1989) (same). Moreover, Winston testified that he was not surprised when McLean had

approached him to participate in the robbery, as McLean had previously

discussed with him robbing drug dealers, and on one occasion in 2009 or

2010 McLean asked Winston to rob a drug dealer located on the same block

where McLean sold drugs. Nor did McLean say anything in his

conversations with Winston, the CI, or the undercover agent to indicate

that he did not know how to do a stash house robbery. To the contrary,

McLean came up with a plan for the robbery that included posing as police

officers, and pointing guns at the people inside the stash house and getting

them on the ground before tying them up. McLean was also knowledgeable

about firearms and the possibility of surveillance cameras, and was familiar

with tactics often used by stash house robbers such as posing as police

officers to convince the occupants of the house to drop their weapons and

abandon the drugs. In sum, McLean was predisposed to commit robberies

of drug dealers, and jumped at the opportunity provided by the CI to do

one.

Nevertheless, McLean claims that the record instead shows a lack of

evidence of predisposition, or at least that the evidence on predisposition

"cuts both ways" and therefore the issue should have been presented to the

jury. Br. 24. McLean is wrong. McLean first points to his lack of prior

convictions for violent offenses, Br. 24, although, as noted above, he does

have prior arrests for robbery and other violent offenses which is evidence of predisposition. However, as noted above, a lack of prior illegal conduct does not satisfy his burden of production regarding predisposition. *See Fedroff*, 874 F.2d at 183. McLean acknowledges that Winston's testimony offered evidence of McLean's predisposition, specifically his testimony that McLean had directed him to a rob a drug dealer on the same block where McLean sold drugs. McLean, however, claims that Winston's testimony provides evidence of lack of predisposition, specifically Winston's testimony that he had never committed any robberies with McLean. Br. 24, citing App. 407. However, this simply shows that McLean did not personally participate in the robbery but instead had Winston do the robbery on his behalf. This hardly shows that McLean was not predisposed to committing robberies.

McLean also claims that Winston testified that McLean was approached by others with the robbery proposal, and that this demonstrates that it was the government which first suggested illegal activity and not McLean. Br. 24. This is incorrect. As noted earlier, the recorded conversation from the June 19, 2013, meeting of the CI and McLean corroborates the CI's account that it was McLean who first broached the topic of doing a robbery. Moreover, Winston, who was

brought into the robbery by McLean after McLean had discussed with robbery with the CI, was not in a position to know whether McLean or the CI first suggested illegal activity. Instead, Winston was testifying that he considered the robbery job as belonging to McLean because McLean was "the one who came across it" and recruited Winston to assist in it, and Winston was simply speculating that as a result someone else must have approached McLean with the idea for the robbery. App. 381-82. This speculative testimony is hardly sufficient to show that McLean was not predisposed to committing robberies.

Finally, McLean claims that text messages sent from his phone on the day before the robbery, which he contends show that he was trying to obtain a firearm, show his lack of predisposition. Br. 24. However, nothing else in the record, including the testimony of Winston, McLean's partner in the robbery, or the recorded conversations between McLean and the CI and the undercover agent, indicate that McLean lacked experience with guns or was not predisposed to use them to commit robberies. Instead, McLean consistently told the CI and the undercover agent that he had guns and was prepared to use them in the robbery. Even if it were true that McLean did not have a gun the day before the robbery and was trying to obtain one, this does not show a lack of predisposition to commit robberies. Instead, the

text messages show that McLean had access to guns and indeed McLean showed up at the robbery with a loaded firearm.

In sum, McLean failed to meet his burden of production for either inducement or lack of predisposition, and the district court was correct to conclude that an entrapment instruction was not warranted. This Court's recent decision in *United States v. Dennis*, 826 F.3d 683 (3d Cir. 2016), does not compel a different result. In *Dennis*, which also involved a reverse sting stash house robbery, this Court found that the defendant had met his burden of production regarding inducement and predisposition. Regarding inducement, the court in *Dennis* relied on a variety of circumstances, including the fact that the informant who introduced the defendant to the government drove the defendant to the first meeting with the undercover agent, asked the defendant to "play the role" of a seasoned robber, supplied a gun to the defendant, and appealed to the defendant's sympathies based on a story of the informant's sick mother. *Id.* at 691. Meanwhile, regarding predisposition, the court in *Dennis* relied on testimony that the defendant had turned away three prior opportunities to join the informant in robberies, the defendant's testimony disavowing violence and that he had not owned a gun in many years, and expert testimony that the defendant was vulnerable to persuasion due to his low IQ. *Id.* at 692. None of these

circumstances are present here. The conviction should therefore be affirmed.

## II. THE DISTRICT COURT CORRECTLY RULED THAT THE GOVERNMENT COULD AND DID PROVE THE INTERSTATE NEXUS REQUIRED BY THE HOBBS ACT

### Standard of Review

On challenges to the sufficiency of the evidence, this Court "view[s] the evidence in the light most favorable to the government, and will sustain the verdict if any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *United States v. McGuire*, 178 F.3d 203, 206 n.2 (3d Cir. 1999). The construction of a statute in accordance with the Constitution is a purely legal issue subject to plenary review. *United States v. Singletary*, 268 F.3d 196, 198-99 (3d Cir. 2001).

### Discussion

McLean argues that the government could not and did not satisfy the jurisdictional interstate commerce element of the Hobbs Act because the intended target of the robbery – a stash house containing eight to nine kilograms of cocaine – was fictional. McLean contends that the district court should have granted a judgment of acquittal on these counts because the evidence failed to satisfy the interstate commerce element. McLean's argument is meritless.

### A.    The Government is Not Required to Prove an Actual Effect on Interstate Commerce in Reverse Sting Fictitious Stash House Cases.

McLean argues that the requirement of showing an effect on interstate commerce can never be satisfied in fictitious stash house stings because in such cases "there is no possibility at all, neither remote, potential, nor *de minimis*, of any effect on interstate commerce." Br. 29. However, as McLean acknowledges, a panel of this Court, in *United States v. Whitfield*, 649 F. App'x 192 (3d Cir. 2016), recently rejected the same argument (and given that the pertinent law in this Circuit is settled deemed the opinion not precedential). *Whitfield* also involved a stash house robbery sting operation, and in that case the defendant claimed the government failed to prove the plan to rob a stash house affected interstate commerce because the stash house, and the cocaine in the stash house, were fictitious. The Court in *Whitfield* rejected that argument, citing *United States v. Jannotti*, 673 F.2d 578 (3d Cir. 1982) (en banc), for the proposition that in cases involving Hobbs Act conspiracy and attempt charges arising from a reverse sting operation it did not matter whether the agreement or attempt to commit the Hobbs Act robbery had an actual effect on interstate commerce because "'the defendants agreed to do acts which, had they been

attainable, would have affected commerce.'" *Id.* at 195-96, quoting
*Jannotti,* 673 F.2d at 591-92.

*Jannotti* involved "Abscam," the well-known government sting
operation in the late 1970s that targeted public officials predisposed to
corruption. The government invented a plot in which an undercover
operative portrayed an "Arab sheik," expressed interest in investing large
sums in business ventures in the United States, and paid bribes for
government assistance. In *Jannotti*, the trial court dismissed convictions
for conspiracy to violate the Hobbs Act, ruling that because the plot was
"entirely fictitious" there was no possible effect on interstate commerce,
and thus no federal jurisdiction. *Id.* at 590. This Court reversed, declaring it
"irrelevant that the ends of the conspiracy were from the very inception of
the agreement objectively unattainable." *Id.* at 591. Stressing the difference
between a substantive Hobbs Act violation, and the inchoate offenses of
attempt and conspiracy charged here, the Court explained the absence of a
requirement of an actual effect on commerce to prove the latter: "In this
case the defendants agreed to do acts which, had they been attainable,
would have affected commerce. At that point, regardless of whether an
actual effect on commerce was 'reasonably probable,' a sufficient federal
interest was implicated to support federal jurisdiction over that

agreement." *Id.* at 592. The Court added: "In essence the defendants are arguing that we should accept an impossibility defense when federal jurisdiction is predicated on interstate commerce. We believe such a defense must be rejected here." *Id.*

In *Jannotti*, the fiction was that the defendants' assistance was needed to facilitate a $30 million hotel construction project. This Court held that the conspiracy to affect this project through extortion, in violation of the Hobbs Act, came within federal jurisdiction, without any requirement that government agents start building a hotel. *Id.* at 594. That holding controls this case. *See also United States v. Manzo*, 636 F.3d 56, 66 (3d Cir. 2011) ("[F]actual impossibility, or the fact that the agreement was 'objectively unattainable,' is not a defense to a charge of conspiracy or attempt."). *See also United States v. Taylor*, 480 F.3d 1025, 1027 (11th Cir. 2007) (agreeing that conspiracy to commit robbery of fictitious drug stash house fell within jurisdiction of the Hobbs Act); *United States v. Rodriguez*, 360 F.3d 949, 957 (9th Cir. 2004) (same).

This Court's decision in *United States v. Manzo*, 636 F.3d 56, 69 (3d Cir. 2011), does not undermine this conclusion as McLean contends. Br. 30-31. In *Manzo*, the Third Circuit affirmed the dismissal of Hobbs Act charges of conspiracy to commit extortion under color of official right and

attempted extortion under color of official right against defendants who
were not public officials during the relevant time frame and therefore had
not acted "under color of official right" in accepting payments in exchange
for future official assistance. Although one of the defendants was a
candidate for mayor at the time he agreed to accept such payments, he was
never elected. The government argued the defendant's failure to obtain
office constituted a factual impossibility which did not preclude attempt or
conspiracy liability. This Court disagreed, holding that the "central status
element of an 'under color of official right' Hobbs Act violation" was an
element of even the inchoate attempt and conspiracy offenses. *Id.* at 67-69.
In so holding, however, the Court specifically distinguished *Jannotti* as a
case "represent[ing] the proper circumstances that support a charge for
conspiracy to commit a Hobbs Act violation," even though "a non-status
element of the offense was not met." *Id.* at 67-68. Indeed, *Manzo* explicitly
recognized that factual impossibility is not a defense to a conspiracy or
attempt charge. *Id.* at 66. *Manzo* thus does not suggest a retreat from
*Jannotti*'s holding. Id. at 68. The defendant here, in contrast, was not
charged with Hobbs Act extortion under a color of right theory, and comes
within the holding of *Jannotti*. *Manzo*'s holding has no application to the

Hobbs Act robbery charges in this case, and the district court properly

rejected the defense claims to the contrary.[4]

### B. The Government is Not Required to Prove That the Defendant's Conduct Would Have Affected Interstate Commerce Even in the Absence of Federal Intervention.

McLean next argues, relying on the Supreme Court's decision in

*National Federation of Independent Business (NFIB) v. Sebelius*, 132 S. Ct.

2566 (2012), that the government was required to prove that his conduct

would have affected interstate commerce even in the absence of federal

intervention. Br. 31-33. However, McLean's reliance on *NFIB* is misplaced.

In *NFIB*, the Supreme Court held that the Patient Protection and

Affordable Care Act of 2010, which required individuals to purchase health

insurance, is a valid exercise of Congress' taxing power. Although five

---

[4] McLean is also wrong that the validity of *Jannotti* is called into doubt by the Supreme Court's decisions, starting with *United States v. Lopez*, 514 U.S. 549 (1995), which place limits on the federal government's Commerce Clause jurisdiction. Br. 30, citing *Lopez; United States v. Morrison*, 529 U.S. 598 (2000); *Jones v. United States*, 529 U.S. 848 (2000); *National Federation of Independent Business (NFIB) v. Sebelius*, 132 S. Ct. 2566 (2012). *See United States v. Urban*, 404 F.3d 754, 766 (3d Cir. 2005) (rejecting argument that *Lopez* and its progeny changed the requirements of proving interstate commerce in individual Hobbs Act cases); *United States v. Clarke*, 649 F. App'x 837, 849-50 (11th Cir. 2016) (unpublished) (rejecting argument that the Supreme Court's decision in *NFIB* implicitly overruled precedent of Circuit Courts that the interstate nexus can be shown in a Hobbs Act conspiracy even when the intended victims and narcotics are fictional.)

justices agreed that this provision did not fall within Congress' authority under the Commerce Clause, the Court's comments about the Commerce Clause, even if binding, do not apply to the Hobbs Act. The provision before the Supreme Court required individuals to take action, while the Hobbs Act prohibits and criminalizes action.

Nor does the *NFIB* decision, either explicitly or implicitly, state that the federal government cannot use reverse sting operations, such as the one used here, as an investigative technique in Hobbs Act cases. Tellingly, McLean fails to cite any cases to support his interpretation of *NFIB*. To the contrary, numerous courts, after the *NFIB* decision in 2012, have consistently held that the interstate commerce element can be satisfied in reverse sting stash house Hobbs Act robbery cases. *See Whitfield; see also United States v. Clarke*, 649 F. App'x 837, 849-50 (11th Cir. 2016) (unpublished) (rejecting argument that the Supreme Court's decision in *NFIB* implicitly overruled precedent of Circuit Courts that the interstate nexus can be shown in a Hobbs Act conspiracy even when the intended victims and narcotics are fictional); *United States v. Holland*, 503 F. App'x 737 (11th Cir. 2013) (unpublished) (holding that a conspiracy to obstruct drug trafficking establishes a sufficient interstate nexus to satisfy the jurisdictional requirement of the Hobbs Act, even where the intended

victims and drugs are fictitious.); *Min v. United States*, 2016 WL 1408099 (E.D. Va. April 7, 2016) (in Hobbs Act conspiracy case where defendant and his co-conspirators sought to steal from a drug dealer, the interstate commerce requirement was satisfied even though the stash house and the victims were fictitious as the crime fell into a "class of acts" that has a "measurable impact upon interstate commerce"); *Harris v. United States*, 2016 WL 830761 (D.N.J. March 3, 2016) (rejecting defendant's argument that Hobbs Act conspiracy charge should have been dismissed due to lack of effect on interstate commerce because the stash house that was to be robbed in the conspiracy was fictitious and created by the government).

In this case, as in *Jannotti*, the conspiracy, if accomplished, would have affected interstate commerce. The plot was to steal eight to nine kilograms of cocaine, with a value in the hundreds of thousands of dollars. It is well established that drugs and drug proceeds inherently and necessarily affect interstate commerce. Commerce in illegal drugs represents "a large interstate market" over which "Congress has the power to regulate." *United States v. Walker*, 657 F.3d 160, 181 (3d Cir. 2011), quoting *United States v. Orozco*, 98 F.3d 105, 107 (3d Cir. 1996). This Court has held "the [G]overnment may satisfy the interstate commerce element of the Hobbs Act by proving that a robbery targeted a drug dealer whose wares

originated out of state." *Walker,* 657 F.3d at 181. The government is not required to present "proof of a 'substantial effect' on commerce in an individual case in order to show a Hobbs Act violation." *Id.* at 179, quoting *United States v. Urban*, 404 F.3d 754, 766 (3d Cir. 2005); *see also United States v. Shavers*, 693 F.3d 363, 373 (3d Cir. 2012) ("Where the robbery 'produces any interference with or effect upon interstate commerce, whether slight, subtle or even potential, it is sufficient to uphold prosecution under [the Hobbs Act].'"), quoting *United States v. Haywood*, 363 F.3d 200, 210 (3d Cir. 2004).[5]

McLean's position is decisively rejected by the Supreme Court's recent decision in *Taylor v. United States,* 136 S. Ct. 2074 (2016). There, the defendant was convicted of two counts of attempted Hobbs Act robbery, for home invasions in which the defendant and others sought to steal marijuana and the proceeds of sale of marijuana, but on each occasion found no drugs and left essentially empty-handed. The Supreme Court confirmed that the attempt to steal narcotics – even locally grown marijuana – presented a sufficient impact on interstate commerce to

---

[5] McLean incorrectly contends that the Hobbs Act requires "an actual link to interstate commerce, not just speculative possibility." Br. 31. This is incorrect. As noted above, this Court has consistently held that the required impact on interstate commerce may be *de minimis*, and that such a *de minimis* effect need only be potential.

- 38 -

warrant culpability under the Hobbs Act. The Court added: "And it makes no difference under our cases that any actual or threatened effect on commerce in a particular case is minimal." *Id.* at 2081. The Court concluded: "Both robberies were committed with the express intent to obtain illegal drugs and the proceeds from the sale of illegal drugs. Such proof is sufficient to meet the commerce element of the Hobbs Act." *Id.* at 2082. That ruling compels affirmance in this case as well.

Here, Detective Christopher Marano, who was qualified as an expert in narcotics trafficking, testified about the effect the contemplated cocaine robbery would have had on interstate commerce if the robbery had occurred. Marano testified about the origins of cocaine, explaining that cocaine is produced mostly in South America and Mexico. App. 433. Marano confirmed that cocaine is not produced anywhere in Pennsylvania, and that any cocaine that is found in Pennsylvania would have traveled across state lines. App 433. He further explained how the theft of eight to nine kilograms of cocaine would affect the illegal market, and gave his opinion that the robbery of a drug dealer would affect interstate commerce. App. 435. Based on Marano's testimony, a rational juror could find that the contemplated robbery would have affected commerce as required by the Hobbs Act.

### C.    The Government Proved, Though Not Required To Do So, That the Defendant Would Have Engaged in Hobbs Act Robbery in the Absence of Federal Intervention.

McLean, without citing any cases to support his position, also contends that the government should be required to prove that he would have committed a Hobbs Act violation even in the absence of government intervention. Br. 35-36.[6]  This argument is also meritless. As noted above, this Court's decision *Jannotti* holds that the relevant inquiry regarding interstate commerce in reverse sting stash house robbery cases is not whether the defendant would have engaged in the robbery absent federal intervention but whether the defendant "agreed to do acts which, had they

---

[6] McLean claims that during the trial "the government implicitly acknowledged that a proper prosecution through a reverse stash house sting operation requires proof that an individual was otherwise engaged in Hobbs Act robberies," citing to trial testimony by Special Agent Edwards and Detective Marano, as well as statements made by the prosecutor in her closing argument. Br. 33-34. However, none of these statements was an implicit acknowledgment that the government must prove that the defendant was "otherwise engaged in Hobbs Act robberies." Instead, the testimony of Special Agent Edwards and Detective Marano, and the statements by the prosecutor, simply informed the jury that law enforcement does reverse sting stash house operations for the purpose of identifying, and arresting, persons who are already committing stash house robberies. App. 135, 437, 585. They were not stating that a reverse sting stash house operation is by law limited to a target who is already engaged in stash house robberies, or that the government is required to prove in such cases that the defendant was already engaged in these robberies.

been attainable, would have affected commerce.'" *Whitfield*, 649 F. App'x at 195-96, quoting *Jannotti*, 673 F.2d at 591-92.

Even if it were true that the law required such proof, there was ample evidence, as noted above, that McLean was predisposed to committing stash house robberies, and would have engaged in a Hobbs Act robbery even absent any federal intervention. His criminal record included four previous convictions for drug trafficking and prior arrests for robbery and attempted murder and gun possession. He had previously discussed robbing drug dealers with Winston, and in 2009 or 2010 had directed Winston to rob a drug dealer on the same block where McLean sold drugs. McLean, far from having to be instructed on how to do a robbery, came up with a plan for the robbery that included posing as police officers, and pointing guns at the people inside the stash house and getting them on the ground before tying them up. McLean was also knowledgeable about firearms, the possibility of surveillance cameras, and tactics often used by stash house robbers such as posing as police officers to convince the occupants of the house to drop their weapons and abandon the drugs. In sum, the government provided sufficient evidence regarding an effect on interstate commerce, and the district court was correct to deny McLean's motions for acquittal on this ground.

### III. THE DEFENDANT WAS PROPERLY CONVICTED UNDER SECTION 924(c) BASED ON HIS HOBBS ACT ROBBERY CONVICTIONS

### Standard of Review

This Court exercises plenary review over challenges to the district court's construction of statutes and case law. *United States v. Singletary*, 268 F.3d 196, 199 (3d Cir. 2001).

### Discussion

McLean asserts that Hobbs Act robbery, and conspiracy to commit that offense, is not a "crime of violence" for purposes of 18 U.S.C. § 924(c), and therefore his conviction under Section 924(c) should be dismissed. That argument is defeated by this Court's precedent.

McLean was convicted under Section 924(c) for carrying a firearm during and in relation to a crime of violence. The statute defines "crime of violence" as an offense that is a felony and either "(A) has as an element the use, attempted use, or threatened use of physical force against the person or property of another, or (B) that by its nature, involves a substantial risk that physical force against the person or property of another may be used in the course of committing the offense." § 924(c)(3). McLean argues that Hobbs Act robbery does not qualify under the first clause (the "elements"

clause), because Hobbs Act robbery may purportedly be committed without the use of physical force; and that the second clause (the "residual" clause) is impermissibly void for vagueness in light of the decisions in *Johnson v. United States*, 135 S. Ct. 2551 (2015), and *Baptiste v. Attorney General*, 841 F.3d 601 (3d Cir. 2016), invalidating similar clauses in other statutes.

McLean's argument is defeated by this Court's decision in *United States v. Robinson*, 844 F.3d 137 (3d Cir. 2016). In *Robinson,* this Court held that a Hobbs Act robbery that was committed while brandishing a gun was a crime of violence under Section 924(c)'s elements clause. The Court found that the categorical approach does not apply in determining if a predicate offense is a crime of violence under Section 924(c) where the predicate offense, in that case Hobbs Act robbery, and the Section 924(c) offense "are contemporaneous and tried to the same jury." *Id.* at 139. Robinson committed two armed robberies, one of a Subway sandwich shop and one of a retail store, during which he brandished a handgun. *Id.* He was convicted of both Hobbs Act robberies and brandishing a firearm during and in connection with one of the robberies in violation of Section 924(c). *Id.* at 140. This Court held that "when . . . the two offenses, robbery and brandishing a gun, have been tried together and the jury has reached a guilty verdict on both offenses," the Hobbs Act robbery qualifies as a crime

of violence under the elements clause of Section 924(c). *Id.* at 139.[7] As the Court noted, "the combined convictions before us make clear that the 'actual or threatened force, or violence, or fear of injury' in Robinson's Hobbs Act robbery sprang from the barrel of a gun." The Court cautioned that the courts "may not speculate as to facts," noting that "the only facts that may support the conclusion that a particular crime is a 'crime of violence' are those that have either been found by the jury or admitted by the defendant in a plea." *Id.* at 143.

In this case, the defendant was convicted of (among other counts) conspiracy and attempt to commit Hobbs Act robbery, and one count of carrying a firearm during and in relation to a crime of violence, in violation of 18 U.S.C. § 924(c). In *Robinson,* this Court "conclude[d] that analyzing a § 924(c) predicate offense in a vacuum is unwarranted when the convictions of contemporaneous offenses, read together, necessarily support the determination that the predicate offense was committed with the 'use, attempted use, or threatened use of physical force against the

---

[7] The Hobbs Act defines "robbery" as follows: "The term 'robbery' means the unlawful taking or obtaining of personal property from the person or in the presence of another, against his will, by means of actual or threatened force, or violence, or fear of injury, immediate or future, to his person or property, or property in his custody or possession, or the person or property of a relative or member of his family or of anyone in his company at the time of the taking or obtaining." 18 U.S.C. § 1951(b)(1).

person or property of another.'" Therefore, the *Robinson* Court found that the question in that case was "not 'is Hobbs Act robbery a crime of violence?' but rather 'is Hobbs Act robbery committed while brandishing a firearm a crime of violence?'" 844 F.3d at 144.

Under *Robinson*, the question in this case, based on the jury's verdict, is thus whether a robbery committed while carrying a firearm during and in relation to that conduct is a crime of violence. *Robinson* makes clear that the answer is yes.

In arguing otherwise, McLean posits that his 924(c) conviction here was not for brandishing, as in *Robinson*, but for "simply possessing the firearm," Br. 34, and therefore the result should somehow be different. But in fact, McLean was convicted for carrying a firearm during and in relation to the Hobbs Act crime, and thus certainly committed a crime which involved "the use, attempted use, or threatened use of physical force against the person or property of another," § 924(c)(3)(A). As in *Robinson*, the threatened and attempted use of force involved a firearm, settling that his Hobbs Act offense was a crime of violence.

Given that *Robinson* is binding, we present no further argument at this time. However, the government preserves other arguments it has presented at length elsewhere (and will brief further here at the direction of

the Court): (1) under the categorical approach, Hobbs Act robbery is

categorically a crime of violence under the elements clause;[8] (2) the same

result applies as a matter of statutory construction, given that Hobbs Act

robbery is a quintessential violent offense to which Congress expressly

aimed to apply the penalty provision of Section 924(c), and a contrary

ruling would produce an absurd result; and (3) the residual clause of

Section 924(c)(3)(B) is distinct from that invalidated in *Johnson* and

remains valid and applicable here.[9]

Finally, McLean particularly disputes that conspiracy to commit a

Hobbs Act robbery is a crime of violence.[10] However, this Court has rejected

---

[8] *See, e.g., United States v. Hill*, 832 F.3d 135, 144 (2d Cir. 2016) (applying the categorical approach, Hobbs Act robbery is a crime of violence under § 924(c)); *United States v. Howard*, 650 F. App'x 466, 468 (9th Cir. 2016) (unpublished) (same); *Robinson*, 844 F.3d at 151 (Fuentes, J., concurring).

[9] This last issue has divided the Circuits, and may be resolved by the Supreme Court in *Sessions v. Dimaya,* No. 15-1498 (argued on Jan. 17, 2017). *Dimaya* presents the question of the vitality of the residual clause in 18 U.S.C. § 16(b), which parallels § 924(c)(3)(B).

[10] McLean acknowledges that the 924(c) offense rested on his substantive convictions for both Hobbs Act and drug trafficking crimes, but posits that the 924(c) conviction fails if even one of the offenses of conviction cannot stand as a 924(c) predicate. Br. 43. In making this assertion, he relies on a line of precedent that is no longer valid, in light of *Hedgpeth v. Pulido*, 555 U.S. 57 (2008), which applies harmless error review in that type of situation. Here, any error was unquestionably harmless; the Hobbs Act and drug trafficking convictions rested on the

a similar argument made in the context of the elements clause of the Armed
Career Criminal Act, 18 U.S.C. § 924(e), and held that a conviction for
conspiracy to commit a violent crime is itself a violent crime. In *United
States v. Preston*, 910 F.2d 81, 87 (3d Cir. 1990), the defendant argued that
his prior conviction under Pennsylvania law for conspiracy to commit
robbery was not a violent felony under the ACCA's elements clause because
the use or threat of physical force was not specifically mentioned as an
element of the crime of the conspiracy statute nor did criminal conspiracy
necessarily involve conduct that presented a serious potential risk of
physical injury to others. *Id.* at 84. The Court in *Preston* disagreed, holding
that conspiracy to commit robbery, in violation of Pennsylvania law, was a
violent felony under ACCA because Pennsylvania law required that the jury
find the objective of the conspiracy, and where that objective is robbery, the
elements of the offense satisfy the elements clause of ACCA. *Id.* at 86-87.[11]

---

same underlying conduct, that is, the effort to steal drugs through an armed
robbery; the jury, upon concluding that McLean carried a gun during and in
relation to this conduct, surely would have convicted for the 924(c) offense
regardless of which particular statutory predicate was cited. In any event,
the issue need not be reached given that every charged predicate in this
case was valid.

[11] To support his position, McLean cites cases from the Fourth, Fifth,
and Tenth Circuits holding that certain state law robbery conspiracy
convictions are not violent felonies under the ACCA's elements clause nor
have as an element of use of physical force against another, Br. 42, but

Likewise, in this case, the district court instructed the jury that in order to find McLean guilty of Hobbs Act conspiracy it had to find that he joined an agreement "to carry out actions which satisfy the elements of Hobbs Act robbery," which the district court defined as "the unlawful taking obtaining of personal property" from another person "by means of actual or threatened force or violence or fear of injury." App. 679, 683. Therefore, the fact that the government must show that the defendant intended to commit a robbery, which by definition requires the actual or threatened use of force, and that he took a step toward commission of that robbery by making a plan to do so with the intent that the robbery would be carried out, and he carried a firearm in connection with that offense, demonstrates that conspiracy to commit Hobbs Act robbery in this case is a crime of violence under § 924(c)(3)(A). *See United States v. Hill*, 832 F.3d 135, 140 (2d Cir. 2016) (noting with approval its prior holding that "conspiracy to commit Hobbs Act robbery is a crime of violence under the Bail Reform Act (which employs the same definition as in § 924(c)(3)) because one of the elements of the offense is 'actual or threatened use of force' and 'if the element of violence is not present, no conviction under

---

conspiculously fails to cite this Court's decision in *Preston*.

section 1951 can occur."'), quoting *United States v. DiSomma*, 951 F.2d 494, 496 (2d Cir. 1991).

For all these reasons, the district court properly treated Hobbs Act robbery as a 924(c) predicate, and McLean's 924(c) conviction should not be vacated.

## IV. THE FELON-IN-POSSESSION STATUTE IS A VALID EXERCISE OF CONGRESS' POWER UNDER THE COMMERCE CLAUSE

### Standard of Review

This Court exercises plenary review of the district court's interpretation of a provision of law. *Gibbs v. Cross*, 160 F.3d 962, 964 (3d Cir. 1998).

### Discussion

McLean argues that the Court should overrule *United States v. Singletary*, 268 F.3d 196 (3d Cir. 2001), in which this Court upheld the constitutionality of 18 U.S.C. § 922(g)(1) against a challenge that it was beyond Congressional authority under the Commerce Clause. The issue is raised in this case in order to preserve the claim for review by the United States Supreme Court. As the rulings in *Singletary* and *United States v. Gateward*, 84 F.3d 670 (3d Cir. 1996), are correct, they should not be overruled.

McLean asserts that Section 922(g)(1), which bars possession by a convicted felon "in or affecting commerce, any firearm or ammunition," is unconstitutional because it does not regulate an activity that substantially affects interstate commerce. McLean claims to find support for his position

in *United States v. Lopez*, 514 U.S. 549 (1995); *United States v. Morrison*, 529 U.S. 598 (2000); and *Jones v. United States*, 529 U.S. 848 (2000).

In *Singletary*, this Court, writing after the Supreme Court cases cited by the defendant, squarely rejected this argument. *Singletary*, 268 F.3d at 205. In light of this binding precedent, McLean's claim should be denied. In this case, the government submitted ample evidence of an interstate nexus for the guns under *Singletary* and *Gateward*, proving that the guns were manufactured outside of Pennsylvania, and therefore crossed a state line before winding up in the defendant's possession. App. 665. Contrary to McLean's claim, the government was not required to prove that the defendant himself transported the guns across state lines. *See Singletary*, 268 F.3d at 204-05. This Court has rejected the defendant's argument previously, and should do so again.

## CONCLUSION

For the reasons stated above, the government respectfully requests that the judgment of the district court be affirmed.

Respectfully submitted,

LOUIS D. LAPPEN
Acting United States Attorney

*/s Robert A. Zauzmer*
ROBERT A. ZAUZMER
Assistant United States Attorney
Chief of Appeals
Pa. Bar No. 58126

*/s Andrew J. Schell*
ANDREW J. SCHELL
Assistant United States Attorney
Member of New York Bar

United States Attorney's Office
615 Chestnut Street, Suite 1250
Philadelphia, PA 19106
(215) 861-8646

# CERTIFICATION

1. The undersigned certifies that this brief contains 10,948 words, exclusive of the table of contents, table of authorities, and certifications, and therefore complies with the limitation on length of a brief stated in Federal Rule of Appellate Procedure 32(a)(7)(B).

2. I hereby certify that the electronic version of this brief filed with the Court was automatically scanned by OfficeScan Real-Time Scan Monitor, version 10.5, by Trend Micro, and found to contain no known viruses. I further certify that the text in the electronic copy of the brief is identical to the text in the paper copies of the brief filed with the Court.


*/s Andrew J. Schell*
ANDREW J. SCHELL
Assistant United States Attorney

## CERTIFICATE OF SERVICE

I hereby certify that this brief has been served on the Filing User

identified below through the Electronic Case Filing (ECF) system:

Susan M. Lin, Esq.
Kairys, Rodovsky, Messing & Feinberg LLP
The Cast Iron Building
718 Arch Street, Suite 501 South
Philadelphia, PA  19106


*/s Andrew J. Schell*
ANDREW J. SCHELL
Assistant United States Attorney

DATED:  March 9, 2017.